UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ELPIDIO MOJARRO-RAMIREZ,<br>also known as "Pilo,"<br><br>Defendant. | **FILED UNDER SEAL**<br><br>Case Number _____ |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Kevin D. Novick, being duly sworn, hereby depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I have been a Special Agent with the Drug Enforcement Administration ("DEA") since March 2017. I am assigned to the Los Angeles Field Division, Financial Investigations Group. Prior to becoming a Special Agent, I was a commissioned officer in the United States Coast Guard for six years where I conducted law enforcement operations with a maritime nexus, including law enforcement operations which related to international narcotics trafficking. I have conducted physical and electronic surveillance, administered confidential sources, and received training in narcotics enforcement. I have been trained in the tactics and methods that drug trafficking organizations use to manufacture, transport, and distribute drugs and drug proceeds.

2.  As set forth in 21 U.S.C. § 878, as a DEA Special Agent, I am empowered by law to conduct investigations and make arrests for, but not limited to, offenses enumerated in Title 21of

1

the United States Code.   As set forth in 21 U.S.C. § 878(1), any officer or employee of the DEA may "execute and serve search warrants, arrest warrants, administrative inspection warrants, subpoenas, and summonses issued under the authority of the United States."

3.   This affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint against Elpidio MOJARRO-RAMIREZ (hereinafter "MOJARRO-RAMIREZ"), with conspiracy to distribute a Schedule II controlled substance, cocaine, knowing and intending that it would be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 959(a), 960 and 963; as well as with conspiracy to distribute a Schedule II controlled substance, cocaine, on board an aircraft registered in the United States, in violation of Title 21, Section 959(c), 960, and 963.

4.   Because the sole objective of this document is to establish probable cause, it does not contain all facts known to me or other DEA personnel.   The information included herein is based upon my own knowledge of the investigation, information from other agents, and my review of available documents.   In some instances, the communications described in this affidavit were originally made in Spanish; in those cases, my knowledge is derived from draft English translations.

## STATUTORY AUTHORITY

5.   For the reasons set forth herein, there is probable cause to believe that MOJARRO-RAMIREZ committed violations of Title 21, United States Code, Sections 959(a), 959(c), 960, and 963.   Pursuant to 21 U.S.C. § 959(a), it is "unlawful for any person to manufacture or distribute a controlled substance in schedule I or II or flunitrazepam or a listed chemical intending [or] knowing, that such substance or chemical will be unlawfully imported into the United States

2

or into waters within a distance of 12 miles of the coast of the United States." Pursuant to 21 U.S.C. §959(c), it is "unlawful for…any person on board an aircraft…registered in the United States to manufacture or distribute a controlled substance…or possess a controlled substance…with intent to distribute." Pursuant to 21 U.S.C. § 963, "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

6. Title 21, United States Code, § 960 sets forth the penalties for violations of Sections 959(a) and 959(c). Additionally, 21 U.S.C. § 959(d) indicates that Section 959 is "intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States."

## **PROBABLE CAUSE**

7. Since 2015, the DEA has investigated the criminal activity of MOJARRO-RAMIREZ. MOJARRO-RAMIREZ and his co-conspirators were responsible for trafficking thousands of kilograms of cocaine and marijuana from various locations in Mexico, Central America, and South America to the United States and elsewhere.

8. The investigation revealed that MOJARRO-RAMIREZ and his associates used various locations in Mexico to serve as a hub from which cocaine was received from South America and other locations within Mexico, and therefrom further distributed by criminal associates to other locations within Mexico and the United States. MOJARRO-RAMIREZ and his associates used clandestine airstrips, vehicles (including those outfitted with hidden compartments), and maritime vessels to transport large scale quantities of cocaine from Mexico, Central America, and South America to the United States and elsewhere.

9. From my training, experience, and knowledge of this investigation, I have learned that the corruption of local and federal public officials is a common feature of foreign drug trafficking organizations. In this case, MOJARRO-RAMIREZ and his associates are responsible for the bribery of members of Mexican and United States law enforcement, as well as Mexican and Venezuelan military personnel. Specifically, the investigation has revealed that MOJARRO-RAMIREZ and his associates bribed numerous Mexican and United States law enforcement personnel to allow the transportation and trafficking of drugs through their areas of jurisdiction including the use of U.S. Ports of Entry to transport drugs into the United States from Mexico. Additionally, MOJARRO-RAMIREZ and his associates bribed members of the Mexican military and law enforcement to conduct searches and carry out operations against members and locations associated with rival or competing drug trafficking organizations. Furthermore, MOJARRO-RAMIREZ and his associates bribed Venezuelan military officials in order to obtain permission for their drug transporting aircraft to enter and exit Venezuelan airspace.

10. Through the course of the investigation, it was revealed that MOJARRO-RAMIREZ had coordinated, transported, or assisted in the transportation of thousands of kilograms of cocaine from Central America, South America, and Mexico for further distribution in Mexico, Europe, and the United States.

11. The investigation has shown that MOJARRO-RAMIREZ has worked with multiple high level associates in his efforts to manufacture, transport, and distribute narcotics since the 1980s. Eventually, MOJARRO-RAMIREZ rose to the level of head of the Mexican drug trafficking organization known as the Milenio Cartel.

12. The investigation has shown that MOJARRO-RAMIREZ coordinated the transportation of

cocaine from Mexico to the United States, including but not limited to: (1) working with co-conspirators, beginning in approximately 1994, to transport cocaine via tractor-trailer within Mexico which MOJARRO-RAMIREZ knew would be further distributed to the United States; (2) working with co-conspirators on multiple occasions, beginning in approximately 1996, to transport cocaine from Central America into Mexico as well as from South America into Central America through the use of tractor-trailers and later via aircraft, knowing that at least the majority of the cocaine would be further distributed into the United States; and (3) coordinating with co-conspirators to transport shipments of cocaine from Costa Rica to Mexico through the use of news trucks associated with a Mexican media company, knowing that at least the majority of the cocaine would be further distributed into the United States.  MOJARRO-RAMIREZ's drug trafficking activities through these methods and others continued into approximately 2015.

13.     Based on my training, experience, knowledge of the investigation, conversations with other agents, and review of the reports associated with this investigation, I know that by approximately 2000, and continuing until approximately 2011 when the cartel effectively disbanded, MOJARRO-RAMIREZ was a high ranking member of the Milenio Cartel who, along with his associates, used various means of conveyance to transport and smuggle marijuana, cocaine, and precursor chemicals used in the production and manufacturing of methamphetamine.  As a high ranking member of the Milenio Cartel, MOJARRO-RAMIREZ used bribes in order to allow drugs to be imported, transported, or otherwise smuggled and not to be interdicted by law enforcement or military personnel.  Furthermore, I know that MOJARRO-RAMIREZ used bribes to have Mexican authorities conduct operations against competitor drug trafficking organizations in order to maintain a competitive advantage over those other organizations.  Additionally, the

investigation has revealed that MOJARRO-RAMIREZ received payments in U.S. currency; from my training and experience, I believe that this indicates that at least a portion of the cocaine shipments which he arranged were destined for the United States.

14. The investigation has revealed that, early in his drug trafficking career, MOJARRO-RAMIREZ was arrested, convicted in 1988, and sentenced to 96 months in federal prison in the United States. While in custody, he continued to engage in drug trafficking by helping to facilitate the further transportation of cocaine within the United States, following its importation into the United States from Mexico.

15. MOJARRO-RAMIREZ served his sentence in multiple facilities and locations, but ultimately escaped from federal custody by walking away from a federal prison camp in Yankton, South Dakota on or about February 27, 1993. He returned to Mexico, having only served four years and eight months of his sentence.

16. The investigation has revealed that, after returning to Mexico, MOJARRO-RAMIREZ resumed his narcotics trafficking activities, and it is believed that he enlarged the scope of his trafficking operations through contacts he had made while in prison in the United States. For instance, MOJARRO-RAMIREZ coordinated with Colombian co-conspirators in or about 1994 to arrange for suitcases of cocaine to be sent to Mexico City's airport via a commercial flight; coordinated with co-conspirators located in Colombia in or about 1996 and 1997 to distribute multi-hundred kilogram shipments of cocaine from Guatemala to Mexico; coordinated in or about 1999 through 2002 shipments of cocaine from Central America to Mexico for further distribution into the United States; and worked with members of the Milenio Cartel from 2006 to 2010 to facilitate cocaine shipments which would ultimately be imported into the United States.

17. The investigation has revealed that in 2010, MOJARRO-RAMIREZ was chosen to be the head of the Milenio Cartel. Rival members of the organization did not agree with the decision to make MOJARRO-RAMIREZ the leader and began rebelling against MOJARRO-RAMIREZ through threats of kidnappings and violence. The rivals of MOJARRO-RAMIREZ began calling themselves Cartel de Jalisco Nueva Generacion, or "CJNG."

18. In approximately 2011, the Milenio Cartel effectively disbanded, although the investigation has shown that MOJARRO-RAMIREZ continued to engage in drug trafficking activities thereafter.

19. Specifically, the investigation has revealed that in May 2014, MOJARRO-RAMIREZ was introduced to a Colombian national (hereinafter co-conspirator 1) ("CC-1") in Mexico City. CC-1 sought the assistance of MOJARRO-RAMIREZ in transporting a load of cocaine from Venezuela to Honduras via airplane. MOJARRO-RAMIREZ was being paid with the proceeds of 32 percent of the cocaine onboard, which was to be sold to the Honduran who received the load at the airstrip at a price of $10,500 per kilogram. Because the transaction was arranged in U.S. dollars, and because the assignment was to move cocaine northward from Venezuela to Honduras, I have concluded based on my experience and training that MOJARRO-RAMIREZ knew or intended that at least some of the load was destined for the United States.

20. In order to consummate the arrangement, MOJARRO-RAMIREZ needed an airplane to transport the loads. The investigation has revealed that MOJARRO-RAMIREZ obtained a Cessna 210 aircraft in the United States.

21. The attempted transport of narcotics using this aircraft occurred in approximately July 2014. CC-1 was present in Mexico and was in charge of coordinating the shipment with a co-

conspirator in Venezuela (co-conspirator 2) ("CC-2").  CC-2 was in charge of coordinating with three high ranking Venezuelan military officials in order to obtain security codes which would permit the safe passage of the aircraft through Venezuelan airspace.  On July 11, 2014, while attempting to land in Maracaibo, Venezuela to pick up a 475 kilogram load of cocaine, the aircraft crashed due to a miscalculation of fuel causing the aircraft to be heavier than anticipated.

22. The investigation has revealed that after the crash, MOJARRO-RAMIREZ coordinated the purchase of a second aircraft, an Azteca, which was to be used to transport a cocaine load from Venezuela to Central America.  The aircraft, obtained in the United States, was flown to Mexico. In or about September 2014, the flight departed Mexico for Venezuela, where it was to pick up the cocaine shipment, but while in route, eight kilometers from the Venezuelan airstrip, the airplane crashed.  This load had been intended to consist of 650 kilograms of cocaine.

23. The investigation has revealed that, in October 2014, following the crash of the Azteca airplane, MOJARRO-RAMIREZ participated in a meeting in Bogota with CC-1 and other co-conspirators to discuss another aircraft shipment of cocaine. The parties discussed the means of financing the purchase of an aircraft which would be used to transport 1,000 kilograms of cocaine. Ultimately, however, the financier failed to follow through on providing the money for the aircraft purchase.

24. The investigation has revealed that in November 2014, MOJARRO-RAMIREZ arranged to obtain the use of a U.S.-registered Challenger 600 airplane in Mexico that could transport a multi-thousand kilogram amount of cocaine.  MOJARRO-RAMIREZ attended a meeting in Mexico with other co-conspirators, including CC-1, to negotiate the terms of use of the aircraft. The planned load was to be transported using the aircraft in January 2015.  With this load, similar

to the previous attempts detailed above, MOJARRO-RAMIREZ was to be paid with the proceeds of a portion of the cocaine that he would be transporting.   Because the price of the cocaine was discussed in U.S. dollars, and because MOJARRO-RAMIREZ and his co-conspirators planned to move the cocaine northward from Venezuela, I have concluded based on my experience and training that MOJARRO-RAMIREZ knew or intended that the load would be ultimately destined for the United States.

25.     The aircraft eventually arrived in Venezuela to pick up a load of cocaine, but blew a tire upon landing, limiting the amount of cocaine the plane could transport on its return flight.   1,500 kilograms of cocaine were loaded onto the plane in Venezuela.

26.     The investigation has revealed that, after takeoff, the aircraft was shot down by the Venezuelan military.   Law enforcement and/or Coast Guard officials in Aruba responded to the crash site in Aruban waters off the coast of the Colombia-Venezuela border, but no survivors were reported.   Aruban law enforcement authorities recovered approximately 488 kilograms of cocaine from the crash site in the ocean on January 29, 2015, immediately following the crash. Aruban air traffic control recordings also show that the Venezuelan military attempted to contact the aircraft, identifying it by its U.S. based tail number, prior to the crash.

27.     Based on the foregoing facts, I submit that probable cause exists that Elpidio MOJARRO-RAMIREZ did knowingly and intentionally conspire with others to distribute cocaine, a Schedule II controlled substance, intending and knowing that the controlled substance would be unlawfully imported into the United States, and to distribute cocaine on board a U.S. registered aircraft, in

9

violation of Title 21, United States Code, Sections 959(a), 959(c), 960, and 963.

                                            Kevin D. Novick, Special Agent
                                            Drug Enforcement Administration

Sworn and subscribed before me this
_____ day of February, 2018
at Washington, DC

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE